Kashdan v. George Mason University, and Ms. Garecki, we'll hear from you. Good morning, and may it please the court, my name is Cara Garecki, and I represent Dr. Todd Kashdan, the appellant and plaintiff below. This appeal concerns the district court's federal Rule 12b6 dismissal of Dr. Kashdan's case in its entirety with prejudice. The first issue I would like to address is whether Dr. Kashdan adequately pled a plausible inference of gender bias in support of his Title IX erroneous outcome claim. Dr. Kashdan's Title IX erroneous outcome claim should not have been dismissed. When viewing the facts alleged in the complaint in the light most favorable to Dr. Kashdan, it can plausibly be inferred that the key decision-makers in Dr. Kashdan's Title IX proceeding wrongly disciplined him because he is male. Dr. Kashdan's allegations fall within the ambit of Title IX cases nationwide in which federal courts have permitted plaintiffs to proceed with discovery. Which paragraphs in your complaint do you say make that allegation? Of gender bias, Your Honor? That the erroneous outcome claim is determined on the basis of his male gender and that that's a but-for cause of his discipline. Because in order to survive the motion to dismiss, obviously you have to make allegations that plead what the law requires. So that's what I'm asking. What are your best paragraphs in the complaint to do that? Yes, Your Honor. In response to that question, there are allegations about the Title IX investigator named Megan Simmons who was removed from Dr. Kashdan's case for gender bias. That's paragraph A143. Also, paragraph A44 of the complaint. Regarding the sole adjudicator or decision-maker in his Title IX proceeding, we have Dr. Jennifer Hammett, the Title IX coordinator. Evidence of her gender bias is located at A46, also A331 and A332, A79, A296, A89 to 90. Also, Dr. Hammett credited the female complainant's allegations over Dr. Kashdan's even though there was compelling evidence that refuted the assertion that he engaged in sexual harassment. Those allegations are located at A95 to 96, A99 to 100, also A70 to A72, A74, A81, also A82 and A83. You're given pages and there's a lot of paragraphs on each page. So maybe when you come up at rebuttal you can give us some specific paragraphs. Yes, Your Honor. I'd be happy to. As alleged in the complaint, Dr. Jennifer Hammett, and as previously mentioned, was the sole decision-maker in Dr. Kashdan's Title IX proceeding, meaning any evidence of Dr. Hammett's gender bias is particularly probative. That's under Doe v. Marymount University. Dr. Hammett has publicly expressed views which reflect outdated and stereotypical views of gender. She also had written findings in Dr. Kashdan's case that reflect stereotypical views of gender. Her role as the decision-maker in Title IX proceedings for George Mason University conflicted with her role as the enforcer of Title IX on the campus, particularly at a time when Mason was under public scrutiny for the mishandling of Title IX complaints of female students. Dr. Hammett herself was criticized in the student newspaper months before Dr. Kashdan's Title IX proceeding. She was criticized for the mishandling of a female student's sexual harassment allegations against a male student. The second decision-maker involved in Dr. Kashdan's Title IX proceeding was Dr. Julian Williams, who handled his appeal. Mr. Williams made public statements reflecting a pro-female approach to Title IX complaints. That is page A30. You know, all of these references you're talking to is a disagreement with the school's decision, and maybe even a misguided decision that the school has traditional or outdated views of gender. But is there a difference between the substance of the decision-making and the treatment of the case? In other words, disciplining the professor because he had different views is quite different than disciplining the professor because he was male. And I'm not sure, this gets a little bit back to Judge Agee's question, is do we have any alleged evidence that the decision was made because he was a male and not because of the views he held or the practices he followed in his class? I think if you read fairly the entirety of the complaint, it reflects the school's position that he went beyond the bounds of proper educational practices and got involved into the personal lives and practices of students and himself, contrary to the policy of the university. And the question that we really have to probe is whether the school made the decision because he was male. And I'm not, maybe you could focus on that. Yes, Your Honor. The views that I was referring to in my prior argument actually referred to the views of Dr. Hammett and Mr. Williams. I understand, and you say those are decision-makers, and they had obsolete views of gender or views of gender different from the professors. But the question I have is that hardly states that the decision was made because he was male. Your Honor, the views of the decision-makers here did not necessarily differ from Dr. Cashtan's. Their views concerning the position of the female students who complained about Dr. Cashtan's alleged misconduct, sorry, the decision-makers' views about the female complainants differ from the… Where would we be if the students, the female students brought an action against the university based on Cashtan's conduct and statements in the classroom and outside the classroom with students? They would say they were interfered with their ability to learn because they were females and they were treated as females by the professor and were being baited and provoked and stimulated sexually, creating a hostile work environment. That would be their claim, wouldn't it? The female students? Yes, Your Honor, but I… That's what the university looked at and said, we can't have that in our classroom. I mean, he was dismissed because of a Title IX, the school thought he violated Title IX, and now he's coming back and saying the school violated Title IX. But it seems to me your argument, and maybe I'm wrong on this, but it seems to me your argument is that he had more progressive views of gender and sex and sexual practices than did the school, and that disagreement led to his firing as opposed to the fact that he was not firing, he was disciplined. His discipline was based on the fact he was a male, and I think there's a significant difference between those two things. Yes, Your Honor, to answer your question, I do not believe that the complainants, Complainants 1 through 4, would succeed on a case in an action against George Mason because Dr. Kasdan… Well, they may not, but that's what the school concluded. And we don't have to decide whether the school was correct, but that was what the school was addressing. And when you have female students complaining about practices that I think many people would wonder whether they're appropriate in the classroom, things that were being stated, inquiries of students' own personal sexual practices, how many times they've been to bed with somebody, he explaining his own sexual conduct and events, aren't these legitimate questions that ought to be raised about is that appropriate practice in a classroom, especially when the female students are complaining and don't believe that's appropriate? No, Your Honor, the question raised by the school was not about appropriate or inappropriate practices, it was whether or not Dr. Kasdan was a sexual harasser under the school's Title IX policy. What's the difference? There is a difference. I mean, if he created the environment about which the women were complaining, a hostile female environment or very sexually laden discussions, as opposed to more objective discussions that didn't involve the professor himself and the students themselves, I think that was their problem. And the question is whether they're right or wrong, that looks like the real reason they gave it. I don't know what other reason they gave. Your Honor, there was compelling evidence submitted by Dr. Kasdan to the decision makers in his case that none of the complainants suffered a denial of access to their education or educational opportunities. Complainants 1 and 2, their allegations relating to Course A and Course B. Well, maybe this university got that wrong. But that's what they believed based on the complaints. And the casual observer looking at this would be certainly worried about whether the classroom and the relationship between professor and students was an appropriate one under Title IX. And I think that's where the school came from. There's a very different view, Your Honor, between whether or not behavior is appropriate or whether or not a faculty member violates Title IX. The Course A and Course B examples that Dr. Kasdan gave were discussed years prior to the complaints being brought. The students themselves, Complainants 1 and Complainants 2, gave Dr. Kasdan rave reviews for those courses in their student evaluations. Isn't this kind of a distinction between this case and some of the cases you cite? Everything we've been talking about so far is the women and the professor pretty much agree on the facts of what happened. He did say it in a certain context, etc. They just disagree about whether it rises to the level of harassment or whether he thinks the women welcomed these comments. They say it was pressure from a professor to get a good grade, you had to participate. But both parties pretty much agree that these things happened. It's not he said, she said, like a lot of the cases that are cited in this area. Dr. Kasdan did acknowledge certain facts that they occurred, but he denied engaging in any sexual or gender-based harassment. Right, he disagrees on how it's characterized, but he admits it happened. No, because, for instance, his examples in Course A and Course B were given to the entire class. There was no language directed at students based on their gender. Again, the parties agree on basically what happened. That's what I hear you saying. I'm just pointing out that's a distinction, and so many of these cases are he said, she said types of cases. She says it happened, he said it didn't. The allegations of those complaints say we have reason to think the administrators took the women's word and disregarded all of the male testimony. There's some sort of linkage to allege a but-for-cause here. That's the sort of evidence that we're trying to find in your complaint. Well, there are a number of cases in which Title IX respondents that have been accused of sexual misconduct have arguably admitted certain of the allegations. So Doe v. Baum was one of them. 903 F. 3rd 575. Doe v. Rector and Visitor of George Mason, 149 F. Sub 3rd 602. And Norris v. University of Colorado, 362 F. Sub 1001. In those cases, at the motion-to-dismiss stage, the courts held that even though the respondents had admitted certain facts had occurred, that the claims could proceed to discovery because the respondent had denied engaging in sexual misconduct. There was a nuanced distinction where perhaps in Norris, for instance, he admitted to pinning a woman's arms over her head, which was part of the underlying charge, but not to engaging in sexual misconduct. You're running sort of short on time here. Do you want to say something about your selective enforcement claim? Yes. In light of the court's Shepard decision, I do believe a similarly situated comparator is necessary. So we will not be arguing that Dr. Cashtan's complaint against Complainant 4 alleges a selective enforcement claim. And we do believe that under the case law, you can allege selective enforcement upon information and belief when the records are exclusively in possession of the university. Is that it? You've got some rebubble. Thank you, Ms. Greicke. Mr. Ferguson. Good morning, Your Honors, and may it please the Court. Andrew Ferguson on behalf of the university. I'm joined by Kevin Gallagher, Deputy Solicitor General. This court should affirm the judgment of dismissal. First, to prevail on his Title IX claim, Dr. Cashtan must show that his sex was the but-for cause of the university's decision to sanction him. His allegations of supposed anti-male bias fall woefully short of plausibly pleading that the university would not have sanctioned him except for his sex. And I would like to address very briefly the particular allegations that my friend on the other side has raised that show or that purport to show the anti-male bias. I want to begin with the erroneous outcome problem. I agree with what I understand to be the panel's impulse here, that erroneous outcome itself doesn't tell the court anything about whether there was anti-male bias. And anti-male bias after Shepard has to be the but-for cause for the decision. And I think that's made obvious for the reason that even if a university correctly applied an internal harassment policy, but the reason that they applied the internal harassment policy was because they were discriminating against the target of the harassment policy on the basis of sex, there would still be a Title IX claim. The erroneous outcome itself just doesn't lend itself to any particular inference one way or the other, which is why this court explained in Shepard it's insufficient to show procedural anomalies or a disagreement over what the facts are or how to read the facts. A plaintiff in a Title IX case has to show evidence of anti-male bias. The evidence that my friend on the other side has pointed to are some public statements from two university administrators who are tasked with enforcing Title IX that express the view that A, it is important to enforce Title IX, and B, that if a Title IX is not vigorously enforced, students might not feel safe. I just don't think that anything in those statements, which are found at pages 331 to 333 of the Joint Appendix, can be remotely read to suggest an inference of anti-male bias. And certainly the plaintiff is entitled to every reasonable inference from his allegations, but not to any inference whatsoever. And none of the statements that are at issue here suggest anti-male bias. I want to briefly address the due process claim before moving on. The court has held now repeatedly that short of a termination, the only way that some sort of internal transfer or discipline can qualify as a due process violation is if it results in the employee, quote, being effectively excluded from one's trade or calling as by being thrown out on the street, end quote. I think the minor temporary adjustments to Dr. Cashton's employment status simply don't qualify as being thrown out on the street. And this court has been quite adamant, both in Hall and in Ridpath, that the test is, was the demotion effectively a termination? This was not effectively a termination. He remains a tenured professor of psychology. He's been publishing profusely during the period that this appeal has been pending in this court. I just don't think we can fairly describe this as having been thrown out on the street. So is the short term aspect of the discipline what distinguishes this case? Because as I understand the plaintiff's argument here, it's that I was a high level Ph.D. professor. I only dealt with graduate students. And now I'm back to teaching Psych 101. And that's a significant change in my field. Is the temporary nature of that the main distinguishing factor? It certainly cuts in favor of the university, Judge Agee. I don't think it's the main distinguishing factor. In fact, even if the restrictions weren't temporary, I would probably be making the same argument. I'll just use Ridpath as the counterexample here. In that case, the plaintiff was removed entirely from one department, ceased to exercise any of the functions of his previous job, and was shipped off to a different side of the university. And the court held, look, that effectively was a termination from his previous position. Admittedly, he was reassigned within the same entity. But he doesn't operate any of the faculties of his previous position. That just isn't true here. Professor Cashton remained a tenured professor of psychology with teaching and research obligations. And he continued to teach and research during the period that the sanctions were in effect. And of course, accepting the disaffiliation sanctions, the general probationary period regarding his relationship with grad students has expired during the pendency of this appeal. So he's back to that in any event. But no, I think that the temporary nature cuts in favor of the university. But I do not think that the university's position would fall if the adjustments were permanent. And unless the court has additional questions, the university is comfortable resting on its briefs for the remaining arguments. All right. Thank you, Mr. Ferguson. Ms. Gorecki? I'd briefly like to address the due process arguments that were just raised. Most of the points made related to things that are not in the record, that Dr. Cashton is publishing prolifically. He's now working with graduate students. Those facts are not in the record. We would have been happy to have Dr. Cashton give testimony on this issue. What I can say is that his disaffiliation from the clinical psychology program is five to six years at a minimum. And he is still not teaching within that program, not working with grad students from that program, not involved in any of the governance he was previously involved in. Also, he's not currently working with graduate students. So our view is that he did suffer a significant demotion and a perilous detour in his career because he had founded and chosen to affiliate with the clinical psychology program and has been unable to do that. Am I correct that his compensation was not reduced? His base salary was not reduced, but because of the restrictions placed on him, he is not entitled to merit-based pay increases as well as standard increases in his salary. But other than the disaffiliation part, all of the other sanctions, if that's the correct word, were short-term. Is that correct? No, Your Honor. The graduate student sanction that prohibited from working with graduate students was supposed to end in 2021, but it did not because the clinical psychology program disaffiliation overrode that, precluding him from working with graduate students for a lengthier period of time. He has alleged that graduate students are the life force of his research and his success is due to them, and that has not changed. He's not able to work with graduate students in any program. And I'd like to also add that Dr. Cashtan's chosen traitor calling was not just a professor and not just a professor of psychology. It was a professor affiliated with the clinical psychology program, and to him, not being able to rely on the life force of his research is a significant and perilous detour in his career path. And I yield the rest of my time. All right. Thank you. Thank you. We'll come down and greet counsel, and then we'll proceed on to the next case. Thank you. Thank you. All right. The next case we're going to hear this morning is the United States v. Miller. And Ms. Powell, whenever you're ready, we'll hear from you. All right.
judges: Paul V. Niemeyer, G. Steven Agee, Allison J. Rushing